# Mays v. Commonwealth.

(Decided Dec. 18, 1936.)

Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

Upon his first trial, the appellant, John H. Mays, was given a sentence. of sixteen years upon a conviction of manslaughter. The judgment was reversed because of error in the instructions. Mays v. Commonwealth, 260 Ky. 235, 84 S. W. (2d) 20. Upon a second trial, he was again convicted and his punishment was fixed at five years' imprisonment. The only ground upon which a reversal of the judgment is sought is that the verdict is flagrantly against the evidence.

The decedent, Kelton Ashcraft, came into Beattyville with his wife and twelve year old son about 10:30 o'clock one night in October, 1934. Leaving them in his automobile, he proceeded to the beer saloon of John Kincaid. When it closed at 11 o'clock, Ashcraft and friends came out and started up Main street. While there is some evidence to the contrary, we think it is clear that Ashcraft was then very drunk. There was some disturbance along the way, and the defendant, Mays, a city policeman, came up and took Ashcraft in charge. According to his widow and some others, Mays

without cause struck Ashcraft violently with his pistol as they went along. But it appears from the evidence of disinterested witnesses it was not only justified but was necessary. At the drugstore corner, Mays and his prisoner turned and proceeded down a street, in the direction of the jail. On this street back of the drugstore is Judge Gourley's law office, and just beyond that is the Beattyville Hotel. Across this street on the corner is the courthouse, and back of it the county jail. There is conflict in the evidence as to who went down this way with the officer and his prisoner, for it appears that most of those who had been on Main street with Ashcraft, or had been attracted by his arrest, stopped at the corner. The widow and son testify that out in the street in front of Gourley's office, which was about 150 feet from the corner, Mays knocked Ashcraft down and, as he was in the act of getting up, shot him, and then after he had fallen back on the street he shot him again. She knocked up the pistol so when he fired the third time the ball went wild. The other two bullets entered Ashcraft's abdomen and went straight through and came out his back. The widow's brother, Shelby Estes, testified to having seen what occurred from the corner, although it was dark down where the shooting took place. His evidence is that Mays was shoving Ashcraft diagonally across the street (which would be toward the jail), while his wife and boy were begging Mays not to kill him. Immediately after the shooting, the witness went up there, and he says that Mays had his pistol drawn and threatening the wife and child. He seized and grappled with Mays until he promised to do no harm to him or any one else.

Considering the evidence of the defendant and all the witnesses, particularly several who were not involved, we think it clear that the officer was justified in arresting Ashcraft for public drunkenness and breach of the peace, and that he forcibly resisted arrest; also, that some of his companions interfered and endeavored to rescue the prisoner. The defendant's evidence is that Ashcraft struck him in the face with his fist and that he pulled his blackjack or billy, which was wrung from him by some one in the crowd. During the melee he struck Ashcraft with the butt of his pistol. It appears that Shelby Kincaid came on the scene and at his insistence the crowd abandoned their interference with the

officer somewhere about the corner. There is no doubt that as Mays was working his way with his prisoner down toward the jail, he was being violently resisted. His testimony is that Estes, Pierson, and Campbell, and Ashcraft's wife, also went down that way and continued their interference. In front of Gourley's office, some one struck him and knocked him partially down and the men crowded upon him, trying to take his pistol away. Mrs. Ashcraft was choking him. While he was flat on his back on the street with Ashcraft on top of him, he fired in the air at an angle in the direction of the sidewalk. When Ashcraft did not get off him, he got his pistol under his body and shot twice.

The testimony of a guest at the hotel, and of a woman who was staying in the residential quarters on the second floor of the jail, as to having heard certain exclamations, together with several undisputed circumstances, bear out the defendant's evidence and claims. Thus a bullet lodged twelve or thirteen feet up in the wall of Gourley's office, which would not have occurred if the location fixed by the commonwealth's witnesses was correct. There was dust on the defendant's back immediately afterward, and he had a skinned knee, with a hole rubbed through his trousers at the knee. His lip was cut and he had several bruises on and about his face and neck. It would appear impossible for the bullets to have ranged straight through the body as they did if Ashcraft at the moment had been in the act of rising, as the widow testified, and there was no indication of the bullets having struck the concrete paving, as the testimony shows they would have done had Ashcraft been prone on the street. Other disinterested witnesses sustain the defendant's claims. The testimony of the widow and son was different in important particulars from that given on the former trial.

The officer was dealing with a rebellious prisoner, surrounded by his friends who had obstructed the arrest. It may be true that as to what occurred at the immediate scene of the tragedy, the letter of evidence is conflicting. It is made apparent from locations and the darkness in which the final and fatal struggle occurred that the brother-in-law, and perhaps others, related things they did not see. The testimony of the widow, son, and brother-in-law is considerably weakened

694

by the contradictions and destroyed by important physical facts about which there are no contradictions. This is practically conceded by the Attorney General.

While a peace officer has limitations placed upon his activities in discharging his duties, he is often confronted wth grave danger. The law gives him the right of self-defense. It also makes it his duty to prevent the escape of. his prisoner by the use of such means as may be necessary or reasonably appears to him at the time to be necessary, even to the extent of taking his life, if such extreme act appeared to be necessary in the exercise of a reasonable judgment. Hatfield v. Commonwealth, 248 Ky. 573, 59 S. W. (2d) 540; Mays v. Commonwealth, 260 Ky. 235, 84 S. W. (2d) 20; Giles & Keys v. Commonwealth, 266 Ky. 475, 99 S. W. (2d) 455.

In the light. of this law, considering the unsubstantial testimony against him and the character of evidence in his behalf, we feel it to be our duty to reverse the judgment on the ground that the verdict is flagrantly against the evidence.

Judgment reversed.

Whole court sitting.